**Comprehensive Sentencing Mitigation Report**

Case No. 3:21-cr-48(S1)-TJC-PDB

Kimberly Michelle Claridy Walker

United States District Court
Middle District of Florida
Jacksonville Division

Prepared by:
The Cord Strategies Group, LLC
Jacksonville, Florida

## **Contents**

Introduction                                                                1

Ms. Walker's Current Posture                                                1

Ms. Walker's History and Characteristics                                   3

Ms. Walker's Mental and Emotional Condition                                9

Ms. Walker's History of Prior Good Works                                   14

Ms. Walker's Community Support                                             15

Factors Militating in Favor of Downward Departure                          16

Statistical Information                                                     17

Factors Militating in Favor of a Variance from the Advisory Guidelines     20

Stakeholders Attitudes toward Sentencing Mitigation                        23

The Need for Compassion and Mercy                                          24

Conclusion                                                                 25

Appendix I Exhibits                                                        A-N

Appendix II Exhibits (*Letters of Support*)                                1-4

## Comprehensive Sentencing Mitigation Report

Kimberly Michelle Claridy Walker
Case No. 3:21-cr-48(S1)-TJC-PDB

## Introduction

According to the provisions of 18 U.S.C. § 3553, the court shall impose a sentence that is sufficient, but not greater than necessary, to comply with statutory purposes of sentencing, and in determining such sentence, the court shall consider, inter alia, (1) the nature and circumstances of the offense and the history and characteristics of the defendant, and (2) the need for the sentence imposed as set forth in § 3553(a)(2).  In consideration of the sentence that must be imposed in this case, Kimberly Michelle Claridy Walker respectfully requests that the Court consider the following information in mitigation of her sentence:

## Ms. Walker's Current Posture

### The Defendant's Response to Her Status

On February 23, 2022, Ms. Walker pleaded guilty to Counts One and Four of the Superseding Indictment.  She has fully come to terms with her error in judgment since the government's case against him has come into fruition.  Ms. Walker greatly laments her involvement in this offense, and the associated harm to the community, as well as the costs and inconvenience to the government and the people of the United States.[1]  Ms. Walker specifically stated:

> I very much regret my actions leading to this case. I hate that my children and husband were involved. I was actually tired of the life I was living and was in the process of trying to change. I had resolved that the last time I did it was to be the last time but by that time it was too late because the arrest came. The life I was living was the only life I've ever known with the upbringing that I had. I had to take care of my siblings when I was a child because they would ask my mom 'why are we not eating.' I wish I would have pushed harder to stop and wish I had more help. After a while I started getting it, but the change came too late. I needed people in my life who wanted me to do better. I didn't fully know how to change, especially coming from Lake City.

---

[1] Walker, Kimberly. 17 March 2022. Personal interview.

On April 13, 2021, Ms. Walker was arrested and made an initial appearance. She was detained pending sentencing by the Magistrate Judge. As of the date of sentencing, Ms. Walker will have been detained without incident for approximately 21 months. During her detention, Ms. Walker has been involved in leading daily prayer groups and church attendance. Bradford County Sheriff's Deputy for corrections Capt. Dalton Diggs, contextualized Ms. Walker's time in detention by stating:

> Ms. Walker has been here just under 700 days, and while most inmates in her situation are focused on how to get out of accepting responsibility, Ms. Walker has not done that; she has taken complete ownership of her behavior. She caters to new inmates on how to survive their experiences and conducts herself as something of a mother hen for them. If I were to go before a panel of some sort, I would have to say that she's changed and is not blaming anyone. Ms. Walker seems to have really shown a Godly repentance for what she has done.[2]

*Collateral Consequences of the Offense*

In addition to the usual consequences of incurring a felony conviction, such as the loss of certain civil rights, such as the privilege of voting, Ms. Walker was interested in social advocacy, ironically, in support of convicted felons, and becoming an advocate for better funding for higher education. Relatedly, knowing that her conduct has contributed to the felony convictions of three of her children, including one, who had no prior criminal history, Ms. Walker is morosely plagued by her anguish and shame, as well as the legal jeopardy they now face, and the possibility of significant prison terms awaiting them.

Second, and more specifically, Ms. Walker's conduct leading to her conviction has directly and irrevocably altered her ability to contribute to the upbring of her nine-year-old daughter at a most vulnerable time in the life of the child. Given the current age of the child, coupled with the extreme length of the advisory guideline imprisonment range, Ms. Walker will have forfeited participating in the life of the child through balance of her entire childhood. In fact, if sentenced to even the low end of the range, the child would be approaching age 39 upon Ms. Walker's release from imprisonment. This circumstance

---

[2] Diggs, Dalton Capt. 1 January 2023. Personal interview.

2

is aggravated by the fact the child has persistent medical problems requiring close monitoring and frequent hospitalizations.  Moreover, Ms. Walker's father, the child's father, is a codefendant in this case and is facing a similarly extensive imprisonment range under the guidelines system.

## Ms. Walker's History and Characteristics

The following information regarding Ms. Walker's history and characteristics is offered as a supplement to the very thorough presentence investigation and report conducted by the United States Probation Office:[3]

It is undeniable that Ms. Walker has not only committed a very grievous offense against the community but has also disgraced herself and her family.  In doing so, she sacrificed her flesh and blood – her own children – in its involvement; contributing greatly to their delinquency.  In many ways, her leadership of them mirrors the source of her own misdirected path in life, which itself was the result of cyclical pathological factors reflecting the overbearing hardships of her own receipt of inadequate parenting.  To her shock and dismay, Ms. Walker – in exercising maternal instincts over her children -- has excavated the tragedy of her own youth in its consummation. The presentence report tracks this miserable pathway by documenting an extreme history of parental neglect and abuse, leading Ms. Walker on an uphill road of catastrophe without plateau, with guarantees without reward.

As is proverbially the case, Ms. Walker was born to a 17-year-old mother and a father, age 28, who quickly abandoned his relationship with Ms. Walker's mother, throwing her into great poverty.  Subsequently, her mother began a relationship with the late Guy Allen Sr., no more reliable than her natural father, when Ms. Walker was age six.  Mr. Allen was physically abusive to both Ms. Walker's mother and her children, while being plagued with alcoholism, crack cocaine abuse, and compulsive

---

[3] Special compliments are extended to Senior United States Probation Officer Irish Anderson for an extensive presentence investigation report, and particularly her very thorough treatment of the Personal and Family Data section of the report.

gambling.  When Ms. Walker was age eight, her mother shot Mr. Allen at close range and was arrested and charged with attempted murder.  During Mr. Allen's hospitalization, his condition deteriorated to the point of him becoming comatose.  In addition to her exposure to the trauma of this event, Ms. Walker was forced to endure the emotional distress of the uncertainty of her mother being convicted of an offense and losing her to a lengthy term of imprisonment.

When Mr. Allen finally recovered from his injuries, Ms. Walker was released from the suspension of her emotional condition, as the prosecution against her mother was dropped because Mr. Allen could not identify her as the person who shot him.  Difficulties from Ms. Walker's relationship with Mr. Allen did not cease upon his recovery.  According to Ms. Walker, he was a philanderer who frequented bars accompanied by various women, prompting her mother to drag Ms. Walker and her siblings to such establishments in attempts to rescue Mr. Allen and bring him home. Such events were interposed with severe episodes of domestic battery by Mr. Allen. Ms. Walker indicated that when Mr. Allen beat her mother, she intervened in often futile efforts to protect her mother from the beatings.  Ms. Walker's efforts were met with physical retaliation against her by Mr. Allen.

These circumstances lasted until Ms. Walker was age 11, at which time her mother began secreting what money she could to extricate herself and her children from the abusive situation. Although this decision was met with some relief by Ms. Walker, it instilled fear in her because of the financial insecurity that would follow.[4]  When they did move to another house, poverty again became front and center, resulting in such things as electrical disconnections due to inability to pay. At this point, Ms. Walker was the oldest of three siblings, and felt inordinate pressure to provide for them financially because her mother could not.  Celeste Bradley, age 69, was a teacher's assistant in Lake City when Mr. Walker was in

---

[4] According to the presentence report, Ms. Walker's mother was never employed during the course of her life.

middle school and knew Ms. Walker's mother, as well as the family dynamics at that time.[5] Ms. Bradley indicated that she was aware that Ms. Walker had an inordinate desire to help her siblings in the face of abject poverty; she stated, "Kim always had to look out for the welfare of others even at a young age. She is one of the warmest, honest, and dedicated persons I know."

Confounded by how to support her siblings, Ms. Walker began shoplifting from local stores for items necessary to their survival. Miss Walker's criminal conduct was viewed with a wink and a nod by her mother because Ms. Walker was making provisions for the family that her mother could not. With this conflict in moral guidance, Ms. Walker soon began taking shoplifting orders from others to supplement her income from this behavior. This period of time was further complicated by her mother's inappropriate physical discipline when she began beating Ms. Walker with an extension cord. Ms. Walker reflected that this was a seminal moment in her life because of the poverty and travail, she vowed to herself that if she ever had children, she would eschew the need for a man for support, given the failures of her birth father and her stepfather, Mr. Allen.

At age 14, while she continued shoplifting, Ms. Walkers mother was engaged in the sale of drugs.[6] Her mother trafficked in drugs for at least four years during this period of time.[7] Ms. Walker's siblings clearly saw Ms. Walker as a mother figure, prompting Ms. Walker to double down on her illicit conduct to support them. According to her sister, Lakeisha Allen, age 41, Ms. Walker, "she is a good person but tried to take care of her siblings by stealing."[8] Ms. Allen added, "I think our mom was bipolar."[9] Then, at age

---

[5] Bradley, Celeste. 3 June 2022. Personal interview.

[6] Appendix I, Exhibit A. For example, in 2000, Ms. Walker's mother was placed on drug offender probation for aiding and abetting the sale of cocaine.

[7] Id. Kimberly Walker.

[8] Allen, Lakeisha. 7 June 2022.

[9] Ms. Allen and Ms. Walker are the daughters of the late Joanne Chapman.

15, their mother personally began selling crack and powder cocaine.  During this time, Ms. Walker met Neal Walker and became pregnant with his child at age 15.[10]  Ms. Walker was in the 9th grade during her pregnancy and quit school. Ms. Walker gave birth to her first child at age 16 and became pregnant again by Neal Walker within two months after the delivery.

When Ms. Walker was age 17, Neal Walker was sentenced to a term of three years in the Florida Department of Corrections (FDOC). The following month, she gave birth to her second child. Desperate to take care of her children, Ms. Walker became more heavily involved in drug trafficking.  Within three years, Ms. Walker began a relationship with Bradley Williams, and became pregnant with his child, Brandiesha Williams.  Mr. Williams was interviewed and acknowledged selling drugs with Ms. Walker.[11] Ms. Walker suffered from postpartum depression and was prescribed Paxil for two or three months without counseling or other intervention. Miss Walker indicated that the source of her depression at the time was that Mr. Williams was a "compulsive cheater."  By age 20, Ms. Walker had given birth to three of her six children.

On April 24, 2000, Ms. Walker began her first FDOC commitment. Prior to the beginning of her sentence, Ms. Walker had become pregnant with her son Mar'quez Mickler through a relationship with Marcus Mickler.  Marquez was born in prison during this term of incarceration.  Simultaneous to her release from her first FDOC commitment, Ms. Walker met Marcus Peterson Sr., and subsequently became pregnant with his child, Marcus Peterson Jr.  Ms. Walker's prison sentence included the birth of her son Marcus Jr., where she got only 24 hours to attempt to bond with him prior to her return to custody.  Given the constraints of her confinement following the birth of the child, Ms. Walker suffered a second period

---

[10] Ms. Walker was a minor when she became pregnant.  Neal Walker was an adult at age 21; five years older than Ms. Walker at the time.

[11] Williams, Bradley. 19 December 2022. Personal interview.

of postpartum depression.  Within a year, her half-brother Guy Allen Jr., was killed in an occupational accident causing his neck to be broken.  Ms. Walker's depression was deepened when a request for a furlough to attend her brother's funeral was denied by the FDOC.

On November 2, 2011, Mrs. Walker was released from her second FDOC commitment and subsequently reunited with Neal Walker.  On February 1, 2013, Neal Walker was released from his 30 year commitment at the FDOC.  Since Mr. Walker did not want to return to the Lake City area, the couple relocated to Jacksonville.  Within two years, Ms. Walkers's mother died following a stroke and a period of time on a respirator.[12]  Faced with the difficult decision to take her mother off of life support, Ms. Walker suffered another period of depression without psychological intervention. Complicating matters further, Neal Walker became unfaithful to their relationship.[13]  As Ms. Walker's emotional condition worsened, in response with Mr. Walker's unfaithfulness, Ms. Walker began the use of ecstasy in an unwise attempt to enhance their sexual relationship; hoping that it would curtail his cheating.

### Ja'Neal Walker

Notwithstanding the difficulties in their relationship, the marriage between Ms. Walker and Neal Walker has produced their third child, J            , who was born on                   .[14]        ,, age nine, is a third-grade student living provisionally with her older sister, Ashley Walker.[15]  While a bright and happy child,        is in serious jeopardy of growing up without the presence of either of parents. Even now, and certainly since her parents' arrests on April 23, 2021,        has been without the daily comfort and security of her parents – a period of approximately 21 months as of the date of sentencing.

_____

[12] Appendix I, Exhibit B.

[13] Walker, Neal. 22 April 2022.

[14] Appendix I, Exhibit C.

[15] According to the presentence report, Ashley Walker is described as an unindicted conspirator.

Since birth           has exhibited a series of constant medical problems that have caused her considerable difficulties and dislocations, accompanied by frequent hospitalizations. Her medical records include the following diagnoses and medical conditions, among others:[16]

- Difficult or labored breathing (dyspnea)
- Disease of naval cavity & sinuses
- Middle ear infections
- Gastroenteritis
- Reactive airway disease
- Upper respiratory infections
- Asthma
- Acute pharyngitis
- Viral infections
- Viral syndrome
- Otalgia
- Conjunctivitis
- Persistent asthma
- Allergic rhinitis

has been hospitalized or treated in hospital emergency rooms dozens of times in her short life. According to her current caregiver, Ashley Walker, Ja'Neal has had more than 40 emergency room visits, and has been admitted to hospitals at least five times.[17]   Most of           's acute medical problems are centered around her persistent asthma.

Despite the constancy of medical challenges anticipated for          's future, it is the prospect of her mental and emotional condition, and her status as a "hidden victim" that may have more exponential consequences for this child.[18]  Research has established that a parent's incarceration poses severe threats

---

[16] Appendix I, Exhibit D. (Excerpt).

[17] Walker, Ashley. 11 January 2023. Personal interview.

[18] National Institute of Justice Journal, Issue No. 278 May 2017. Hidden Consequences: The Impact of Incarceration on Dependent Children.

to a child's emotional, physical, educational, and financial well-being.[19] One statistic indicates that children of incarcerated parents are, on average, six times more likely to become incarcerated themselves. With regard to the emotional welfare of the child of an incarcerated parent, one study found that African American children and children who have both a mother and a father incarcerated exhibited significant increases in depression.[20]

Moreover, another study found that children of incarcerated mothers had much higher rates of incarceration — and even earlier and more frequent arrests — than children of incarcerated fathers. The research and advocacy group, Girls Embracing Mothers, has found that most states fail to collect data on the impact of parental incarceration on the wellbeing of children.[21] Consequently, there is no source of reliable information to address the impact of the trauma of the inopportune loss of a mother to imprisonment by a child, especially for young girls.[22] Accordingly, the status of .                 's physical, mental, and emotional development will likely be severely impaired by the imposition of an advisory guideline sentence in this case.

### Ms. Walker's Mental and Emotional Health

It is apparent that Ms. Walker's severely disadvantaged background is inexorably related to her mental and emotional development in a way that foreshadowed her involvement in the instant offenses. On June 22, 2022, she submitted to a psychological evaluation by licensed clinical psychologist Jennifer

---

[19] Ibid.

[20] Ibid.

[21] https://girlsembracingmothers.org/.

[22] Girls Embracing Mothers was established to help reduce the trauma caused by maternal incarceration, particularly for young girls.

M. Rohrer, Ph.D.[23] The evaluation included an acknowledgement of the circumstances of her childhood, which included being raised in poverty, abandoned by her father for another family, and her mother's implicit approval of Ms. Walker's shoplifting and other illegal behavior, beginning at age 11.   The evaluation further highlighted Ms. Walker's history of "depression and anxiety since childhood."

Dr. Rohrer's diagnostic impressions include "persistent depressive disorder (dysthymia) and anxious distress and alcohol, cannabis, amphetamine-type substance, and other substance abuse disorders." Among her treatment recommendations, Dr. Rohrer recommended continued psychiatric treatment/monitoring, placement in RDAP, and individual counseling to address several therapeutic concerns, including depression and abandonment issues.

Adverse Childhood Experiences – Quick Reference

| Category | Was it Present? | | Brief Description | Documentation |
|---|---|---|---|---|
| | ✓ | Score | | |
| Physical Abuse | ✓ | 1 | Mother administered excessive physical beatings causing injury; stepfather administered physical abuse | Self-reported |
| Sexual Abuse | ✓ | 1 | Sexually assaulted by 3 men at age 15 | Self-reported |
| Emotional (verbal) Abuse | ✓ | 1 | Threats by mother's boyfriend when beating mother | Self-reported |
| Physical Neglect | ✓ | 1 | Mom failed to protect her and siblings from stepfather's physical abuse; father failed to | Self-reported |

---

[23] Appendix I, Exhibit E.

| | | | provide support, as did stepfather | |
|---|---|---|---|---|
| Emotional Neglect | ✓ | 1 | Father abandoned family; mother passively allowed her to shoplift at age 11 | Self-reported |
| Household Mental Illness (chronic depression and suicidal issues in the household) | ✓ | 1 | Mother suffered from depression | Self-reported |
| Mother Treated Violently | ✓ | 1 | Stepfather regularly beat mother | Self-reported |
| Parental Divorce | ✓ | 1 | Parents never married; mom divorced stepfather | Self-reported |
| Incarcerated Relative | ✓ | 1 | Brother sentenced for aggravated battery | FDOC inmate release detail |
| Household Substance/ Alcohol Abuse | ✓ | 1 | Mom drank hard liquor; stepfather used illicit substances | Self-reported |
| *Total ACE Score*[24] | | 10 | | |

In accruing 10 ACE points, Ms. Walker is among a very small percentage of children sustaining the maximum number of such experiences.[25] Of special note in the linear progression of Ms. Walker's mental and emotional health is the timeline for Ms. Walker's history of depression, which, other than having received past prescriptions for depression medications taken briefly, is the fact that she has never

---

[24] A Centers for Disease Control-Kasier Permanente ACE study found that adults with an **ACE score of 4 or more were at significantly greater risk for many behavioral, physical, and mental health issues later in life**. https://www.joiningforcesforchildren.org/what-are-aces/.

[25] Gold, Steven N. Phd. Testimony in Duval County, Florida Death Penalty Resentencing Trial. 17 January 2023.

received sufficient therapeutic treatment for these conditions. This is particularly salient in light of her history of trauma, abuse, and extensive history of adverse childhood experiences.  As early as age 15, in 1991, her sister reported to the probation office that her sister noticed her condition, describing her as "depressed," and "distant and sad."

In a disclosure never made by Ms. Walker before rehearsing the events of her life in association with this case, she reported that the depression noticed by her sister resulted from opportunistic sexual assaults perpetrated on her by three adult men shortly after she turned 15 years of age.  She related that although she initially had a romantic interest in one of the men, he lured her to a motel where two other men joined them, demanding sex with her in a plan that was previously agreed upon by the three men. They threatened that if she did not surrender to their demands to have sex with them all, they would leave her abandoned a great distance from home.  Ms. Walker stated that she did not report the incident to police or family because of her shame.  Consequently, Ms. Walker was never in a position to receive psychological intervention to address the extreme trauma associated with this event.

Then later in 1992, and in 1993, respectively, Ms. Walker gave birth successively to her first and second children.  In 1996, she had her third child, and by 1998, she was first diagnosed with depression while still in Lake City, Florida. Next, in 2000, at age 23, Ms. Walker was diagnosed with postpartum depression following the birth of her fourth child in the FDOC.  Again, in 2003, Ms. Walker, was again diagnosed with postpartum depression following the birth of her fourth child while in FDOC custody.[26]

---

[26] A considerable proportion of mothers who experience postpartum depression return to the level of depression of normal controls at four months postpartum and remain in remission throughout a long follow-up period, indicating that for these mothers, depression constitutes a time-limited problem. For a large group of mothers (38 percent), however, postpartum depression is the prelude to the development of a chronic depressive disorder. Alternatively, [...] chronic postpartum depression may perhaps simply be the continuation of chronic depression or dysthymia that is already present. Vliegen, Nicole PhD; Casalin, Sara PhD; Luyten, Patrick PhD. The Course of Postpartum Depression: A Review of Longitudinal Studies. Harvard Review of Psychiatry 22(1):p 1-22, January/February 2014. DOI: 10.1097/HRP.0000000000000013.

Finally, in 2016 at age 40, Ms. Walker experienced her most recent bout with depression in the aftermath of her mother's death. Her mother's death occurred approximately two years prior to the beginning of the conspiracy.

As mentioned earlier, Ms. Walker was evaluated by Dr. Rohrer while in custody at the Bradford County Sheriff's Office.  Dr. Rohrer's summary included her current diagnostic impressions, which included persistent depressive disorder (dysthymia) with anxious distress.  According to current medical literature, "Dysthymia is a serious disorder.  It is not "minor" depression, and it is not a condition intermediate between severe clinical depression and depression in the casual colloquial sense. In some cases, it is more disabling than major depression."[27] Among Dr. Rohrer's concluding recommendations is that Ms. Walker receive "continued psychiatric monitoring/treatment" and "individual counseling" to address a number of clinical issues related to her past.  Dr. Rohrer also recommended the residential drug abuse program (RDAP).

Finally, with regard to her psychological condition, Ms. Walker stated that she "would like mental health treatment to get to the root cause of my problems."  Even since being detained at the Bradford County Jail, Ms. Walker has been a model detainee with respect to taking her medications and her motivation.[28]  She added, "I've never had anyone in my life that I could lean on and take charge of it to guide me in the very best way possible toward self-improvement."  Consistent with her desire to bring about improvements in her situation, the Bureau of Prisons has a special program to address the special

---

[27] Dysthymia,https://www.health.harvard.edu/newsletter_article/dysthymia. "Like major depression, dysthymia has roots in genetic susceptibility, neurochemical imbalances, **childhood and adult stress and trauma, and social circumstances, especially isolation and the unavailability of help** [emphasis added]. Depression that begins as a mood fluctuation may deepen and persist when equilibrium cannot be restored because of poor internal regulation or external stress."

[28] Appendix I, Exhibit F.

needs of female victims of trauma, which is discussed later in the section addressing "Factors Militating in Favor of a Variance from the Advisory Guidelines System."

**<u>Ms. Walker's History of Prior Good Works</u>**

Although Ms. Walker has spent much of her life involved in criminal activity, she has attempted, when possible, to express herself in a manner to exhibiting her true feelings toward others and for the idealized way in which she desired to help the community.  The following is a list of her past endeavors in that respect:

| Organization/Agency | Mission | Contribution |
|---|---|---|
| City Rescue Mission | Black Gala in recognition of success black community members | Cofounder |
| Black Chamber of Commerce | Foster new leadership and business development opportunities | Volunteer |
| Self-initiative | Provided boarding house for indigent persons | Business owner |
| NAACP | Refurbished infrastructure and job development in and around the Edward Waters College community | Board member |
| Self-initiative | Donated free gas to community | Business owner |
| Self-initiative | Founded a trunk-or-treat program for children of all races | Business owner |
| Self-initiative | Provided housing and shelter for the homeless | Business owner |
| Self-initiative | Created a 2nd chance felony friendly program to hire ex-felons | Business owner |
| Self-initiative | Held motivational speaking seminars for adults for self-improvement | Volunteer |

14

| Self-initiative | High schools | Volunteer |
|---|---|---|
| Self-initiative | Founder of Boss Ladies on the Move for self- empowerment of Women | Business owner |
| Self-initiative | Began creating non-profit prison/jail releasees to them get jobs | Business owner |

Regarding Ms. Walker's principal passion – given her history of incarceration -- she has always expressed an interest in working with incarcerated and released former women inmates to help them transition and thrive in the community. Dr. Jennifer Blaylock, a consultant and workforce developer who previously interfaced with Ms. Walker stated, "Kim especially wanted to establish a nonprofit organization to work with incarcerated women and has the heart for it."[29]  Ms. Walker's brother, Earnest Claridy, stated that "Kim loves helping everybody and would give you the shirt off of her back; she has no enemies. She believes in God, and she means the word to me.  I love her very much"[30]  Even now, as referenced earlier, since being detained at the Bradford county jail, Ms. Walker has attempted to use her time in the service of her detention mates.  As indicated by Capt. Diggs, Ms. Walker's stay has been positive and constructive as she has used her time counseling and consoling other women in the facility, leading them in prayer groups and spiritual activities.

### Ms. Walker's Community Support

Ms. Walker continues to receive unwavering support and encouragement from friends and extended family members.  They are in a position to assist and encourage Ms. Walker to comply with any and all conditions of the court upon the completion of any term of imprisonment imposed by the court.

---

[29] Dr. Blaylock, Jennifer. 3 June 2022. Personal interview.

[30] Claridy, Earnest. 17 June 2022. Personal interview.

Additionally, in the aftermath of her conviction in this case, Ms. Walker continues to enjoy support from wider and varied sectors of the community. Ms. Walker's youngest child, Marcus Peterson, Jr. was interviewed in support of the mitigation investigation.[31] With the support and encouragement of his mother, Marcus rose to become a star athlete at Columbia High School.[32] Marcus's athletic prowess won him a scholarship to study and play football at the University of Cincinnati (Ohio).[33] Marcus indicated that "my mom has always been there, encouraging me to do well. It has been hard without her."[34] Marcus plans to major in sports management while at the University of Cincinnati as aspires to play in the National Football League. He indicated that if his plans for the NFL fail to come to fruition, he would like to become an entrepreneur, owning a fleet of food trucks.

Several persons in the general community who are knowledgeable of Ms. Walker's character have written letters of support on her behalf. They are appended to this report for the court's further consideration.[35] The collective theme of their sentiments is that Ms. Walker kind-hearted, considerate, and loving.

### Factors Militating in Favor of Downward Departure

According to USSG §5H1.3. <u>Mental and Emotional Conditions</u> (Policy Statement), mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually, or in combination with other offender characteristics, are present to an unusual

---

[31] Peterson Jr., Marcus. 26 July 2022. Personal interview.

[32] Appendix I, Exhibit G.

[33] Appendix I, Exhibit H.

[34] Marcus Peterson Jr. is the son of Marcus Peterson Sr., a codefendant in the instant case who has been sentenced to 95 months imprisonment.

[35] Appendix Exhibit II-(1-2).

16

degree, and distinguish the case from the typical cases covered by the guidelines.[36]  In this case, there are aspects of Ms. Walker's mental and emotional health that strongly appear to take this case out of the heartland of similarly-situated defendants, and are salient to a departure consideration at sentencing.[37]

As reflected in the presentence report, as well as information intimated in a recent psychological evaluation, Ms. Walker endured physical abuse at the hands of both her mother and her mother's  live-in boyfriend, as well as the overwhelming influence of adverse childhood experiences, resulting in emotional dislocations, for which she has not received sufficient psychological intervention.  This combination of conditions may be established as an extraordinary circumstance not typically present in cases before the Court for sentencing.  Therefore, the Court may find that this circumstances warrants a departure from the applicable guideline imprisonment range.

## Statistical Information

The Sentencing Commission ("Commission") maintains statistics on a combination of variables impacting the actual sentences imposed within the nation, the circuit, and the district, that largely define the comparative configurations of those sentences.  A synopsis of the data is instructive in determining what constitutes a conventional range for the "heartland" of sentences imposed for particular sentencing scenarios.[38]  With regard to the sentences imposed under the career offender provisions, for fiscal year

---

[36] An offender characteristic or other circumstance identified in Chapter Five, Part H (Offender Characteristics) or elsewhere in the guidelines as not ordinarily relevant in determining whether a departure is warranted may be relevant to this determination if such offender characteristic or other circumstance is present to an exceptional degree.  USSG §5K2.0(a)(4).

[37] U.S. v. Walter, 256 F.3d 891 (9th Cir. 2001) (district court should have considered departing under §5H1.3 because the facts of the case appeared to be the "type of extraordinary circumstances that may justify consideration of the psychological effects of the childhood abuse").

[38] Case law provides that for the purpose of avoiding unwarranted sentencing disparities, the court should look to "national disparities between defendants with similar records who have been found guilty of similar conduct." United States v. Conatser, 514 F.3d 508, 521 (6th Cir. 2008).

2021, the **average sentence imposed within the nation was 141 months imprisonment**.[39]  Most notably, of those receiving variances from the advisory guidelines system, almost all offenders (99 percent) received a downward variance.  Finally, the average sentence reduction was 41.2 percent.  In Ms. Walker's case, the **advisory guidelines range of imprisonment is 360 to 480 months imprisonment**.

As is readily apparent, a sentence under the advisory guidelines system would produce two deleterious impacts: 1) It would be contrary to virtually <u>all</u> sentences imposed under the career guidelines paradigm, and 2) It would suggest a sentence that is exponentially greater than those imposed on most other similarly situated career offenders and thus may produce an unwarranted sentence disparity among defendants with similar record who have been found guilty of similar conduct.  The Commission's statistics on sentences imposed, relative to the advisory guideline range, even with respect to the category of career offenders, demonstrate that the majority of cases resulted in <u>Booker</u> inspired, non-government sponsored below range sentences.

There is evidence from the Centers for Disease Control and Prevention to establish that if Ms. Walker is sentenced under the advisory guidelines sentence, such a sentence would constitute a de facto life sentence.  First, the life expectancy for a non-Hispanic black female in the United States is 74.8 years, as of 2021.[40]  This possibility would suggest that at age 46, Ms. Walker might reasonably be expected to live <u>less</u> than 30 years (28.8 to be exact) from the date of sentencing, in the purview of a low-end sentence of 30 years.

---

[39] Appendix I, Exhibit I.  More than half of offenders (57.8 percent) sentenced under the career offender provisions were convicted of an offense involving a mandatory minimum penalty.  There is no such mandatory term of imprisonment applicable in Ms. Walker's case.

[40] Appendix I, Exhibit J.

Second, there is a current literature that establishes that incarceration, by itself, shortens life expectancy for all individuals.  According to a study published by Professor Evelyn Patterson, there is a linear relationship between incarnation and life expectancy: for each year lived behind bars, a person can expect to lose two years off their life expectancy.[41]  Thus, it would appear to be axiomatic that a sentence under the advisory guidelines imprisonment range would further augment the proposition that even a low-end sentence would effectively constitute a life-plus sentence for Ms. Walker.

Third, there is also information to establish, Ms. Walker is also within a demographic group whose life expectancy is further compromised by the threat of a within-the-guideline range sentence. Researchers at the Boston Medical Center found that incarceration was associated with a 65 percent higher mortality rate among black inmates, but no association was found for non-black Americans.[42]  In short, black people had a higher death rate after they had spent time imprisoned, whereas white former inmates lived as long as they would have otherwise.

Consequently, this discrepancy would suggest that a sentence under the advisory guideline range would strongly disadvantage Ms. Walker in contrast to her white counterparts.  Although, according to §5H1.10. Race, Sex, National Origin, Creed, Religion, and Socio-Economic Status (Policy Statement), race is not relevant in the determination of a sentence, a number of studies have shown that even under the guidelines, racial disparities exist.[43]  Accordingly, in this case, the prospect of disparity based on race may have implications for the possibility of over-punishing Ms. Walker should the court impose a sentence under the guidelines.

---

[41] Appendix I, Exhibit K.

[42] Appendix I, Exhibit L.

[43] See Panel Discussion, Disparity in Sentencing – Race and Gender, 15 Fed. Sent. Rep. 160 (2003) (suggesting that racial disparity can result from facially neutral guidelines and other sentencing statutes).

19

Finally, to further compound the adverse consequences of a within-the-guidelines sentence, is the fact that any term of imprisonment served by Ms. Walker will have a negative impact on the life expectancy on her family members.  According to a recent study by researchers from several leading universities, including Duke University and Yale University, and UCLA, people who have an incarcerated or a formerly incarcerated family member have an estimated 2.6 years shorter life expectancy than those with no incarcerated family members, even when adjusted for demographic characteristics like race, household income, gender, and age.[44]  This is especially important in this case because, as discussed earlier, Ms. Walker has a nine-year-old child who may be impacted by this anomaly.

### Factors Militating in Favor of a Variance from the Advisory Guidelines System

First, the history and characteristics of Ms. Walker, as evidenced by her devastating personal history and a reiteration of the facts and circumstances in support of a downward departure reflecting Ms. Walker's mental and emotional shortcomings, militate in favor of a sentence outside of the advisory guidelines system.  The importance of these circumstances is reinforced by the fact that Ms. Walker and codefendant husband are the parents of a nine-year-old daughter with health problems, who will incur the negative effects of their simultaneous sentencings to substantial terms of imprisonment.  Although, according to §5H1.6. Family Ties and Responsibilities (Policy Statement), family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted, the Supreme Court has held that despite the limitations of §5H1.6, a court could grant a downward variance based on family circumstances.[45]  As is clear, the child is an innocent hidden victim with regard to her parents behavior, and both are facing simultaneous and extensive terms of imprisonment under the guidelines.  Accordingly,

---

[44] Appendix I, Exhibit M.

[45] Gall v. U.S., 552 U.S.38, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007) (indicating that "compelling family circumstances" would justify a downward variance from the guidelines).

it is anticipated that a sentence under the advisory guidelines system would be greater than necessary in contemplation of the purposes of 18 U.S.C. 3553(a)(2)(A)(1)-(7).

Second, Ms. Walker's mental and emotional health history may suggest a causal relationship to the circumstances of the instant offense, as well as the nature of her history of criminal conduct. Consequently, it is anticipated that a sentence that balances the need for punishment and protection of the public, in contrast to the need for educational or vocational training, medical [psychological] care, or other correctional treatment in the most effective manner, would constitute a sentence that is sufficient to satisfy all of the purposes of 18 U.S.C. 3553(a)(2)(A)(1)-(7).   Accordingly, a sentence outside of the advisory guidelines system may be warranted in this case.

With respect to the specific needs for the sentence to be imposed on Ms. Walker relative to potential imprisonment, arguably, one of the principle needs for sentencing in this case is to bring about an improvement in Ms. Walker's psychological condition, since it has been significantly impacted by prepubescent trauma and abuse – circumstances beyond her control.   The Federal Bureau of Prisons offers a resource called the Resolve Program, which is specifically designed for females who have been the victims of trauma.[46]  The Resolve Program is a cognitive-behavioral program designed to address the trauma-related needs of inmates.  According to Dr. Tamara Kline, national coordinator for the BOP Resolve Program, the program consists of three phases, and can be completed in approximately two years.[47]  Ms. Walker has expressed a desire to make improvements in her psychological condition and is amenable to treatment.  It is anticipated that her incentive in completing this program may inform and assist the court in assessing the length or adjustment to any term of imprisonment it may impose.

---

[46] Appendix I, Exhibit N.

[47] Kline, Tamera PhD. Personal interview. 19 June 2019.

21

Finally, Bessel van der Kolk, M.D., a psychiatrist, and leading researcher and practitioner in the field of the neuroscience of trauma, and posttraumatic stress disorder, has explained the causal relationship between trauma and the brain's sympathetic (physiological) response, and the implications for understanding the behavioral constraints of its victims:

> We are obviously still years from attaining that sort of detailed understanding [of the ontological workings between brain and mind], but the birth of three new branches of science has led to an explosion of knowledge about the effects of psychological trauma, abuse, and neglect. Those new disciplines are neuroscience, the study of how the brain supports mental processes; developmental psychopathology, the study of the impact of adverse experiences on the development of mind and brain; and interpersonal neurobiology, the study of how our behavior influences the emotions, biology, and mind-sets of those around us.
>
> Research from these new disciplines has revealed that trauma produces actual physiological changes, including a recalibration of the brain's alarm system, an increase in stress hormone activity, and alterations in the system that filters relevant information from irrelevant. We now know that trauma compromises the brain area that communicates the physical, embodied feeling of being alive. These changes explain why traumatized individuals become hypervigilant to threat at the expense of spontaneously engaging in their day-to-day lives. They also help us understand why traumatized people so often keep repeating the same problems and have such trouble learning from experience.
>
> We now know that their behaviors are not the result of moral failings or signs of lack of willpower or bad character—they are caused by actual changes in the brain.[48]

Ms. Walker's personal history makes clear that she has been a victim of extensive trauma, beginning at the earliest phase of life, and continuing throughout late adolescence. As demonstrated earlier, she endured all 10 of the adverse childhood experiences contemplated by the CDC-Kaiser ACE study, which indicates that the impact of the trauma on the brain throughout has emerged as an offender characteristic which explains -- not excuses -- her criminal behavior. As Dr. van der Kolk has articulated, trauma distorts

---

[48] Van der Kolk, Bessel. *The Body Keeps the Score: Brain, Mind, and Body in the Healing of Trauma*. Penguin Books Limited, 2014.

brain functioning, and, in turn, volitional controls.  In view of this factor, it is hoped that the Court will apply the rule of parsimony and exercise a bias toward imposing the least onerous sentence possible under the law.

### Stakeholders Attitudes toward Sentencing Mitigation

A number of stakeholders in the federal criminal justice system are amenable to the consideration of a wider spectrum of factors that courts should consider at sentencing.  In the Sentencing Commission's 2010 survey on the attitudes of United States District Judges, the jurists responded to a question(s) pertinent to the factors in mitigation in this case.

First, regarding a defendant's mental condition, a full 79 percent found this factor to be relevant to the efficacy of departure and variances.  None of the judges felt that the factor is never relevant. Currently, Ms. Walker has diagnostic information according to Dr. Rohrer, identifying both psychiatric and emotional conditions that may be warranted in a determination of departure and variance considerations.

Second, regarding the relevance of family ties and responsibilities on non-guideline sentences, the jurists responded positively to the question at a rate of 62 percent, versus a negative response of two percent.  As substantially addressed earlier, Ms. Walker's has a prepubescent daughter who will effectively be parentless if both of her parents are sentenced to advisory guideline sentences.  At least with respect to the best interest of the child, a guideline sentence might suggest a sentence greater than necessary.

Finally, The Sentencing Project, a research and advocacy reform group in Washington, D.C., challenges the futility and inappropriateness of indiscriminate incarceration to achieve the legitimate goals of societal well-being by positing the following view:

> The United States is the world's leader in incarceration, with 2.2 million people currently in the nation's prisons or jails -- a 500 percent increase over the past thirty years.  These trends have resulted in prison overcrowding, and state governments being overwhelmed by the burden of funding a rapidly expanding

penal system, despite increasing evidence that large-scale incarceration is not the most effective means of achieving public safety.[49]

Accordingly, a wide range of criminal justice practitioners agree, that whenever practicable, courts should apply the rule of parsimony, and exercise a bias toward imposing the least onerous sentence possible under the law.

### The Need for Compassion and Mercy

*"I have always found that mercy bears richer fruits than strict justice."*

- Abraham Lincoln

Ms. Walker understands unequivocally that she is in need of both compassion and mercy from the court as he prepares for sentencing.  She is convicted, not only legally, but personally, and morally, for her involvement in the offense.  Despite all of the factors in mitigation articulated above, Ms. Walker makes no excuses for her behavior, and now fully appreciates the peril that she has visited on her children, and their families and devoted friends.  She understands that she now stands before the court unadorned and is in need of the only two things that can vindicate her – compassion and mercy.[50]

Ms. Walker realizes that he needs compassion and mercy, especially for her nine-year-old daughter: Compassion and mercy for the generational harm caused to her family; something that she is now beginning to gain sufficient insight to fully apprehend.  As noted by the United States Court of Appeals for the Second Circuit, "the opportunity to plead for mercy is another provision in a procedural body of law designed to enable our system of justice to mete out punishment in the most equitable fashion

---

[49] The Sentencing Project: Incarceration, from World Wide Web: http://www.sentencing project.org.

[50] Justice Kennedy's observation --"Our sentences are too long, our sentences are too severe, our sentences are too harsh...there is no compassion in the system; there's no mercy in the system--should be the first sentence in every advocate's next sentencing letter. Justice Kennedy, Anthony (2007, February 15). Senate Lecture on Sentencing Realities [Speech Audio Recording]. Sentencing Law and Policy. https://sentencing.typepad.com/sentencing_law_and_policy/2007/02/justice_kennedy.html.

possible, to help ensure that sentencing is particularized, and reflects individual circumstances."[51]  Ms. Walker humbly asks that the court particularize her sentence, and prays that it reflects her individual circumstances, and those of her family, based on the principles of compassion and mercy that are within the discretion of the court.  Ms. Walker is now in need of the same compassion and mercy that she understands may not be fully deserved.

## Conclusion

In consideration of the forgoing discussion and analysis, there is ample evidence in mitigation to allow the Court to fashion a sentence either in departure, or at variance, or both, from the advisory guidelines system.  This position is particularly supported Ms. Walker's tragic personal history, the consequences of multiple family members being sentenced simultaneously, and the harsh effect on Ms. Walker's innocent minor child.  It is also true that Ms. Walker has suffered immeasurable shame and extreme anguish by influencing several of her other children into behavior that has led to their federal convictions. Ms. Walker thanks the Court for its time and consideration in reviewing this report.  Ms. Walker respectfully requests that the Court utilize this information to impose a sentence that is "sufficient but not greater than necessary" under the circumstances of this case.

---

[51] United States v. Singh, 877 F.3d 107 (2d Cir. 2017).

The forgoing comprehensive sentencing mitigation report has been prepared on behalf of the Defendant at the request of defense counsel and is submitted in support of sentencing before the Honorable Timothy J. Corrigan, Chief United States District Judge in the United States District Court, Jacksonville Division.

Respectfully submitted,

/s/ *C.R. Dawson*

_____

Carlos R. Dawson
Sentencing Mitigation Consultant
Capital/Death Penalty Mitigation Specialist
Jacksonville, FL 32226
e-mail: crd@cordstrategiesgroup.com

# APPENDIX I

# EXHIBIT A

12/7/22, 12:17 PM                                                    Columbia County OCRS



**COLUMBIA COUNTY**     POWERED BY CIVITEK

New Search   Expand All

| Case Number | Filed Date | Case Type | Status | Contested |
|---|---|---|---|---|
| 122000CF000100CFAXMX [00000100CFAXMX] | 01/27/2000 | Felony 22-D | CLOSED | NO |

| Charge Seq # | Description | Date | Phase | Trial |
|---|---|---|---|---|
| 1 | AIDING AND ABETTING IN THE SALE OF COCAINE | 10-26/2000 | Court Adjudication Withheld | No Trial |

| Party Name | Party Type | Attorney | Bar ID |
|---|---|---|---|
| DOUGLAS, ELMER VERNON | JUDGE | | |
| DOUGLAS, ELMER VERNON | JUDGE AT DISPOSITION | | |
| DIXON, JOANNE ARTHUR   Search This Party | ALSO KNOWN AS | | |
| CHAPMAN, JOANNE ARTHUR   Search This Party | DEFENDANT | | 145981 |

**Dockets**

Page : 1      ALL ⌄

| Image | Doc # | Action Date | Description | Pages |
|---|---|---|---|---|
| | | 11/22/2002 | TERMINATION OF SUPERVISION | |
| | | 10/12/2001 | PAYMENT OF $ 44.09 RECEIVED ON CF01 | |
| | | 07/20/2001 | PAYMENT OF $ 96.15 RECEIVED ON CF01 | |
| | | 07/06/2001 | PAYMENT OF $ 96.15 RECEIVED ON CF01 | |
| | | 06/18/2001 | PAYMENT OF $ 40.00 RECEIVED ON ICJTF | |
| | | 06/18/2001 | PAYMENT OF $ 50.00 RECEIVED ON CTFF | |
| | | 06/18/2001 | PAYMENT OF $ 48.61 RECEIVED ON CF01 | |
| | | 05/14/2001 | ORDER OF MODIFICATION OF DRUG OFFENDER PROBATION | |
| | | 05/14/2001 | ORDER OF MODIFICATION OF PROBATION | |
| | | 05/02/2001 | CLOSED FOR VOP WARRANT | |
| | | 05/02/2001 | CASE CLOSED | |
| | | 05/02/2001 | NOT FOUND IN VIOLATION | |
| | | 05/02/2001 | REINSTATE PROBATION | |
| | | 05/02/2001 | CLERKS WORKSHEET | |
| | | 04/05/2001 | DEFENSE ATTY ALLISON SCOTT ASSIGNED | |
| | | 04/05/2001 | PROSECUTOR. BAKER III ROBERT ASSIGNED | |
| | | 04/04/2001 | CTR/CTR  JDG  EV DOUGLAS | |
| | | 04/04/2001 | VIOLATION OF PROB SET FOR 05/02/2001 AT 09:00 IN | |
| | | 04/04/2001 | DEFENSE ATTORNEY NOTICE | |
| | | 04/04/2001 | NOTICE TO DEFENDANT | |
| | | 04/03/2001 | CUSTODY RELEASE FORM | |
| | | 04/03/2001 | DISPOSITION TO BE RELEASED AT 5:00 PM COURT DATE TO SET | |
| | | 04/02/2001 | REOPENED FOR VOP WARRANT | |
| | | 04/02/2001 | DISPOSITION COMMITMENT | |
| | | 03/15/2001 | VIOLATION OF PROBATION WARRANT NOT ENTERED FOR ACTIVE CA | |
| | | 03/14/2001 | NO BOND | |
| | | 03/14/2001 | PD APPOINTED | |
| | | 03/14/2001 | FINANCIAL AFFIDAVIT | |
| | | 03/14/2001 | FIRST APPEARANCE ORDER STATEMENT OF RIGHTS AND RECEIPT OF CHARGES | |
| | | 03/13/2001 | CAPIAS EXECUTED COLUMBIA COUNTY SHERIFF OFFICE By W WARNER | |
| | | 03/13/2001 | AFFIDAVIT VIOLATION OF PROBATION | |
| | | 03/08/2001 | CAPIAS FOR FAILURE TO COMPLY PER JUDGES ORDER | |
| | | 03/08/2001 | OPEN CASE | |
| | | 03/06/2001 | MEMO FROM JUDGE DOUGLAS | |
| | | 11-19-2000 | LETTER FROM DEFENDANT | |
| | | 10/30/2000 | DEFENSE ATTY. BOOTHE DENNIS E ASSIGNED | |
| | | 10/27/2000 | ORDER OF DRUG OFFENDER PROBATION | |
| | | 10/26/2000 | CASE CLOSED | |
| | | 10/26/2000 | ASSESSED INDIGENT CRIM J 40.00 DUE 10/26/2002 | |
| | | 10/26/2000 | ASSESSED COURT FACILITY FEE 50.00 DUE 10/26/2002 | |
| | | 10/26/2000 | ASSESSED (CSO)$275+FINE 325.00 DUE 10/26/2002 | |
| | | 10/26/2000 | REPORTING PROBATION FOR 2 YRS - CNT 1 | |
| | | 10/26/2000 | ADJUDICATED WITHHELD 1 | |
| | | 10/26/2000 | DEFENDANT APPEARED PRES W/ATTY FOR NO TRIAL TRIAL 1 | |
| | | 10/26/2000 | DEFENDANT ENTERED PLEA OF GUILTY 1 | |
| | | 10/26/2000 | OFFER OF PLEA | |
| | | 10/26/2000 | CLERKS WORKSHEET | |
| | | 10/23/2000 | AMENDED INFORMATION FILED | |
| | | 10/19/2000 | CASE CONTINUED UNTIL ROCKET DOCKET | |
| | | 10/19/2000 | CLERKS WORKSHEET | |
| | | 10/18/2000 | FAXED MOTION FOR CONTINUE | |
| | | 10/18/2000 | ORDER ON MOTION FOR CONTINUANCE | |
| | | 10/12/2000 | MOTION TO CONTINUE | |
| | | 10/11/2000 | ORDER GRANTING MOTION TO CONTINUE | |
| | | 10/09/2000 | FAXED LETTER FROM DANIELLE BOOTHE | |
| | | 10/09/2000 | MOTION FOR CONTINUANCE | |
| | | 09/29/2000 | SUPPLEMENTAL ANSWER OF THE STATE TO DEFENDANTS DEMAND FOR DISCOVE | |
| | | 09/19/2000 | CTR/CTR  JDG  PAUL S BRYAN | |
| | | 09/19/2000 | PRETRIAL CONFERENCE SET FOR 10/19/2000 AT 09:00 IN | |
| | | 09/19/2000 | DEFENSE ATTORNEY NOTICE | |
| | | 09/15/2000 | NOTICE TO DEFENDANT | |
| | | 09/08/2000 | ORDER ON MOTION TO WITHDRAW | |
| | | 08/29/2000 | NOTICE TO B C BAIL BONDS | |
| | | 08/29/2000 | DEFENSE ATTORNEY NOTICE | |

| Image | Doc # | Action Date | Description | Pages |
|-------|-------|-------------|-------------|-------|
| | | 08/29/2000 | NOTICE TO DEFENDANT | |
| | | 08/28/2000 | MOTION TO WITHDRAW | |
| | | 08/26/2000 | JDG: EV DOUGLAS | |
| | | 08/28/2000 | ARRAIGNMENT SET FOR 09/06/2000 AT 09:00 IN CTR/CTR. | |
| | | 08/24/2000 | DEFENSE ATTY: PUBLIC DEFENDER ASSIGNED | |
| | | 08/24/2000 | PROSECUTOR: JACOBSEN CRAIG C ASSIGNED | |
| | | 08/22/2000 | DEFENSE ATTORNEY NOTICE | |
| | | 08/22/2000 | NOTICE TO DEFENDANT | |
| | | 08/21/2000 | SUPPLEMENTAL ANSWER OF THE STATE TO DEFENDANTS DEMAND FOR DISCOVE | |
| | | 08/18/2000 | DEFENDANTS PLEA OF NOT GUILTY AND NOTICE OF DISCOVERY | |
| | | 08/18/2000 | STATES RESPONSE TO NOTICE FOR DISCOVERY AND DEMAND FOR RECIPROCAL | |
| | | 08/14/2000 | FILED 1 | |
| | | 08/11/2000 | TRIAL PLEA OF NOT GUILTY WAIVER OF FORMAL PRETRIAL | |
| | | 08/11/2000 | NOTICE OF DISCOVERY | |
| | | 08/11/2000 | NOTICE OF APPEARANCE OF ATTORNEY FOR DEFENDANT | |
| | | 08/07/2000 | FINANCIAL INFORMATION SHEET | |
| | | 08/07/2000 | APPLICATION AND ORDER ON APPLICATION | |
| | | 08/07/2000 | BENCH WARRANT EXECUTED COLUMBIA COUNTY SHERIFF OFFICE By E SILCOX | |
| | | 01/27/2000 | BENCH WARRANT FOR STATE FILED INFORMATION | |
| | | 01/27/2000 | NO ACTION 1 | |
| | | 01/27/2000 | JUDGE EV DOUGLAS ASSIGNED | |
| | | 01/27/2000 | CASE FILED WITH CLERK | |

**Judge Assignment History**

**Court Events**

**Sentences**

| Seq : 1 | Sentence | Status | Date Imposed | Date Effective | Judge At Sentence |
|---------|----------|--------|--------------|----------------|-------------------|
| | Probation 02 Years | Not Applicable | 10/25/2000 | 10/25/2000 | DOUGLAS, E VERNON |
| | Money Imposed | Not Applicable | 10/25/2000 | 10/25/2000 | DOUGLAS, E VERNON |

**Financial Summary**

**Reopen History**

** Pursuant to Florida Statutes and Florida Rules of Court Procedure, records that have been designated as expunged, sealed or confidential may not be available through this service. For additional information on specific records please contact the Clerk of Court.

# EXHIBIT B

5/13/22, 4:22 PM                    Joanne Chapman Obituary (2016) - Lake City, FL - Lake City Reporter

🔍 Search by Name

# Joanne Chapman



Send Flowers

↪

↪ **Share**

**FUNERAL HOME**                    Combs Funeral Home

                                    292 NE Washington St

                                    Lake City, FL

**RECORDS**

View more records for Chapman on Ancestry.com®

Sponsored

**M**rs. Joanne Arthur Chapman, the youngest of five siblings, was born on ⌐        ⌐, 1958, in Jasper, Florida to Leola and Jo Reese Arthur. Both parents precede her in death. Joanne received her education in the Public School System of Hamilton County. On the morning of April 27, 2015, Joanne received her wings at Baptist Memorial Hospital, Jacksonville, Florida. She is preceded in death by her parents; son, Guy Allen, Jr.; sister, Rose Mary Arthur; brothers, Robert James Arthur, Sr. and Jo Lewis Arthur; brother-in-law, Eddie Anderson.

Left to cherish memories: A loving husband, David Lee Chapman; daughters, Kimberly Claridy (Neal), Lakiesha Allen (Terrance); son, Anthony Allen; sister, Barbara Williams; grandchildren, Porschee, Ashley, Brandisha, Arienna, Anthony, Jr., Diamond, Maquez, Alexis, NaKeria, Marcus, Ashanti, Guy III, JaNeal, Aniyah, Kayla; great-grandson, Brandon Jr; hosts of nieces, nephews, other relatives and friends including special friends, Guy Allen, Sr., Earnestine Jones and Kimberly Jones.

Funeral services for Mrs. Joanne A. Chapman will be 11:00 a.m. Saturday, May 7, 2016 at New Day Spring Missionary Baptist Church, 709 NW Long Street, Lake City, FL, Rev. Lantz Mills, Pastor, Bishop Kenneth Troupe, Officiating.

The family will receive friends from 6:00 8:00 p.m. Friday, May 6, 2016 at the funeral home.

Arrangements entrusted to COMBS FUNERAL HOME. 292 NE Washington St., Lake City, FL (386) 752-4366. "The Caring Professionals"

Published by Lake City Reporter on May 5, 2016.



**To plant trees in memory, please visit the <u>Sympathy Store</u>.**

# EXHIBIT C

mail.cordstrategiesgroup.com (350×640)



# EXHIBIT F

*1/3/2023*

*MARSHAL INMATE: WALKER, KIMBERLY*

*DOB: 10/11/1976*

*To Whom it May Concern:*

*I am writing this brief statement on behalf of the above Marshal Inmate Kimberly Walker, currently housed at Bradford County Jail. My name is Laura Mabry, LPN and I am the lead nurse with Bradford County Jail Medical.*

*Ms. Walker has been respectful, timely and compliant regarding her medication and any medical treatments or appointments.  We have not any issues with Ms. Walker.  She is consistent daily, and it is recognized and appreciated by medical staff.*

*Sincerely,*

*Laura Mabry, LPN*

*Bradford County Medical*

# EXHIBIT G

Case 3:21-cr-00048-TJC-PDB    Document 424-1    Filed 01/25/23    Page 41 of 70 PageID 2394

My location
**32218**

# Marcus Peterson: Lake City's very own two-sport stud



(Courtesy: @MarcusPeterson_/Twitter)



**Chayne Riggs, CFP®, ChFC®**
**Financial Professional**
New York Life Insurance Company
Jacksonville General Office
10375 Centurion Pkwy N. Suite 300
Jacksonville, Fl 32256



Proud Member 2022    Mobile: (904) 655-8101

criggs@ft.newyorklife.com • ChayneRiggs.com

**Jalin Coblentz - BVM Sports Contributor**
**Updated:** December 06, 2021

**LAKE CITY, Fla. —** It doesn't matter if it's on the football field or the basketball court, Marcus Peterson is a problem for opposing teams. He stands at 6-foot-4

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

OK          Privacy policy

In basketball, Peterson played a big role in leading Columbia to a 19-6 record in the 2020-21 season. On the year, he averaged 13 points per game, 8.4 rebounds, one block and 1.7 steals. He was a physical presence on both ends of the court and played with a fire and energy that made him unstoppable at times. Peterson has a unique ability to give his team second chances on the offensive end, averaging 4.1 offensive rebounds per game in his junior season.

Having just wrapped up his senior season in football, Peterson is looking to finish his time at Columbia with a strong senior basketball season. He and the Tigers have picked up right where they left off a year ago and are undefeated to start the season. So far, he's averaging 14 points, seven rebounds, two steals and two blocks per game, as well as five offensive rebounds.

While basketball has always been Peterson's first love, his future at college lies on the football field. He is a dynamic wide receiver and a matchup nightmare. Going into his senior season, Peterson was a three-star recruit and listed as the No. 103 player in the state of Florida.

During his junior season, Peterson was a touchdown specialist for the Tigers and managed to reign in 19 catches for 286 yards and seven touchdowns. He even pitched in at running back and quarterback, rushing for four touchdowns and throwing for an additional six. No matter where you put him, Peterson always found a way to score the football.

At the end of June 2021, Peterson had a big announcement for Columbia High School and the football world at large. Following his senior season, he will continue his football career playing for Luke Fickel at the University of Cincinnati in Cincinnati, Ohio.

When making his announcement that he would accept Cincinnati's offer to play

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

PRIVACY POLICY

announce that I'll be taking my talents to the University of Cincinnati."

Columbia's loss is Cincinnati's gain when it comes to Peterson. He was a leader on the football field and on the basketball court, and big things are in store for his future.

This is an unedited user writing submission. The views, information, or opinions expressed in this article are solely those of the author and do not necessarily represent those of Best Version Media or its employees.



Hot news

**Top 10 Rose Bowl games of all time**

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

PRIVACY POLICY

# EXHIBIT H

9/17/22, 1:31 PM
Marcus Peterson - Football - University of Cincinnati Athletics

FOOTBALL

## 2022 Football Roster



Peterson, Marcus ⌄ Go



**15**   MARCUS PETERSON

**POSITION:**  WR

**HT./WT.:**  6-3 / 215

**CLASS:**  Freshman

**HOMETOWN:**  Lake City, Fla.

**HIGHSCHOOL:**  Columbia

🔗 BIO    📷 **RELATED**    📊 **STATS**    🏆 **HISTORICAL**

**PERSONAL:** Consensus three-star recruit and a Top 100 prospect in the state of Florida...Versatile athlete who accounted for 1,128 yards of total offense as a senior, while being responsible for 17 total touchdowns (seven passing, six receiving and four rushing)...Served as team's punter, booting 11 inside the 20...Chose UC over a reported 30 offers, including Georgia, Florida State, LSU, Louisville, Ole Miss, Penn State and Wisconsin.

# EXHIBIT I



# Quick Facts
— *Career Offenders* —

## Fiscal Year 2021

▶ IN FY 2021, 57,287 CASES WERE REPORTED TO THE U.S. SENTENCING COMMISSION.

   ▶ 1,246 OF THESE INVOLVED CAREER OFFENDERS.[1]

      ▶ IN 93.5% OF THESE CASES, THE CAREER OFFENDER STATUS INCREASED THE GUIDELINE RANGE.

### Number of Career Offenders



### Most Common Guidelines for Career Offenders



| | |
|---|---|
| Drug Trafficking | 969 |
| Firearms | 115 |
| Robbery | 105 |
| Other | 57 |

### Sentence Length of Career Offenders



- 20 years or more 12.6%
- Less than five years 9.2%
- Five to less than ten years 27.4%
- Ten to less than 20 years 50.8%

## What is a Career Offender?

A career offender is someone who commits a crime of violence or a controlled substance offense after two prior felony convictions for those crimes. The sentencing guidelines assign all career offenders to Criminal History Category (CHC) VI and to offense levels at or near the statutory maximum penalty of the offense of conviction.[2]

## Offender and Offense Characteristics

- 95.7% of career offenders were men.
- 58.2% of career offenders were Black, 25.5% were White, 13.8% were Hispanic, and 2.5% were Other races.
- Their average age was 40 years.
- 97.9% were United States citizens.
- 43.9% would not change from CHC VI if the career offender provision had not been applied;
  - None would have been CHC I;
  - 0.3% would have been CHC II;
  - 9.1% would have been CHC III;
  - 22.4% would have been CHC IV;
  - 24.3% would have been CHC V.
- The top five districts for career offenders were:
  - Eastern District of North Carolina (56);
  - Southern District of California (48);
  - Southern District of Iowa (45);
  - Eastern District of Missouri (38);
  - Southern District of New York (37).

## Punishment

- The average sentence for career offenders was 141 months.
- 99.4% were sentenced to prison.
- 57.8% were convicted of an offense carrying a mandatory minimum penalty.

## Impact of Career Offender Status[3]

- 45.5% of career offenders had an increase in both Final Offense Level (FOL) and CHC.
  - Their average FOL increased from 23 to 31 and the average CHC increased from IV to VI.
- 37.5% of career offenders had an increase in just the FOL.
  - Their average FOL increased from 23 to 31.
- 10.5% of career offenders had an increase in just the CHC.
  - Their average CHC increased from IV to VI.
- 6.5% of career offenders had no increase in FOL or CHC.

This document was produced and published at U.S. taxpayer expense.
For more Quick Facts, visit https://www.ussc.gov/research/quick-facts.



www.ussc.gov
pubaffairs@ussc.gov
@theusscgov

— *Career Offenders* —

## Sentences Relative to the Guideline Range

- Of the 45.2% of career offenders sentenced under the *Guidelines Manual*:

  - 43.7% were sentenced within the guideline range.

  - 38.2% received a substantial assistance departure.
    ◊ Their average sentence reduction was 48.9%.

  - 14.6% received some other downward departure.
    ◊ Their average sentence reduction was 40.8%.

  - 3.5% received an Early Disposition Program (EDP) departure.[4]
    ◊ Their average sentence reduction was 67.4%.

- 54.8% received a variance; of those offenders:

  - 99.0% received a downward variance.
    ◊ Their average sentence reduction was 41.2%.

  - 1.0% received an upward variance.
    ◊ Their average sentence increase was 62.7%.

- The average guideline minimum increased while the average sentence imposed fluctuated over the past five years.

  - The average guideline minimum increased from 210 months in fiscal year 2017 to 214 months in fiscal year 2021.

  - The average sentence imposed increased and decreased throughout the fiscal years. The average sentence was 144 months in fiscal year 2017 and 141 months in fiscal year 2021.

### Sentence Relative to the Guideline Range (%)



### Average Guideline Minimum and Average Sentence (months)



### Sentence Imposed Relative to the Guideline Range FY 2021



[1] Cases with incomplete sentencing information were excluded from the analysis.

[2] In some cases, a state offense classified under state law as a misdemeanor (e.g., in Iowa, Massachusetts, and Michigan) is considered a felony in determining career offender status. For more information, see USSG §4B1.1.

[3] Cases missing Ch. 2 guideline data and cases in which §4B1.1(c) applied were excluded for this part of the analysis. Cases where both §4B1.1 and §4B1.4 (Armed Career Criminal) applied were assigned to the provision with the higher offense level.

[4] "Early Disposition Program (or EDP) departures" are departures where the government sought a sentence below the guideline range because the defendant participated in the government's Early Disposition Program, through which cases are resolved in an expedited manner. *See* USSG §5K3.1.

SOURCE: United States Sentencing Commission, FY 2017 through FY 2021 Datafiles, USSCFY17–USSCFY21.

# EXHIBIT J

**Vital Statistics Surveillance Report**

Table. Provisional life expectancy, by age, race and Hispanic origin, and sex: United States, 2021

| Age (years) | All races and origins | | | Hispanic | | | Non-Hispanic American Indian or Alaska Native | | | Non-Hispanic Asian | | | Non-Hispanic Black | | | Non-Hispanic White | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| 0. . . . . . . . . . . . . . | 76.1 | 73.2 | 79.1 | 77.7 | 74.4 | 81.0 | 65.2 | 61.5 | 69.2 | 83.5 | 81.2 | 85.6 | 70.8 | 66.7 | 74.8 | 76.4 | 73.7 | 79.2 |
| 1. . . . . . . . . . . . . . | 75.6 | 72.6 | 78.5 | 77.1 | 73.8 | 80.4 | 64.7 | 61.0 | 68.7 | 82.7 | 80.4 | 84.8 | 70.6 | 66.5 | 74.5 | 75.7 | 73.0 | 78.5 |
| 5. . . . . . . . . . . . . . | 71.6 | 68.7 | 74.6 | 73.1 | 69.8 | 76.4 | 60.9 | 57.1 | 64.8 | 78.8 | 76.5 | 80.8 | 66.7 | 62.6 | 70.7 | 71.8 | 69.1 | 74.6 |
| 10. . . . . . . . . . . . . | 66.7 | 63.8 | 69.7 | 68.2 | 64.9 | 71.5 | 55.9 | 52.2 | 59.9 | 73.8 | 71.5 | 75.9 | 61.8 | 57.7 | 65.7 | 66.8 | 64.1 | 69.6 |
| 15. . . . . . . . . . . . . | 61.7 | 58.8 | 64.7 | 63.2 | 59.9 | 66.5 | 51.0 | 47.3 | 55.0 | 68.8 | 66.6 | 70.9 | 56.9 | 52.8 | 60.8 | 61.9 | 59.2 | 64.7 |
| 20. . . . . . . . . . . . . | 56.9 | 54.1 | 59.8 | 58.4 | 55.1 | 61.6 | 46.4 | 42.7 | 50.3 | 63.9 | 61.7 | 65.9 | 52.2 | 48.3 | 56.0 | 57.0 | 54.4 | 59.8 |
| 25. . . . . . . . . . . . . | 52.2 | 49.5 | 55.0 | 53.7 | 50.6 | 56.8 | 42.1 | 38.6 | 45.8 | 59.1 | 56.9 | 61.0 | 47.8 | 44.2 | 51.3 | 52.3 | 49.8 | 54.9 |
| 30. . . . . . . . . . . . . | 47.6 | 45.1 | 50.2 | 49.1 | 46.1 | 52.0 | 38.0 | 34.7 | 41.5 | 54.3 | 52.1 | 56.1 | 43.5 | 40.0 | 46.7 | 47.7 | 45.3 | 50.2 |
| 35. . . . . . . . . . . . . | 43.1 | 40.7 | 45.5 | 44.5 | 41.7 | 47.2 | 34.3 | 31.2 | 37.4 | 49.4 | 47.3 | 51.2 | 39.1 | 35.9 | 42.1 | 43.1 | 40.9 | 45.5 |
| 40. . . . . . . . . . . . . | 38.6 | 36.4 | 40.9 | 39.9 | 37.3 | 42.5 | 30.8 | 28.0 | 33.8 | 44.6 | 42.5 | 46.3 | 35.0 | 32.0 | 37.7 | 38.7 | 36.5 | 40.8 |
| 45. . . . . . . . . . . . . | 34.2 | 32.1 | 36.4 | 35.5 | 33.0 | 37.8 | 27.4 | 24.8 | 30.0 | 39.9 | 37.9 | 41.5 | 30.9 | 28.1 | 33.4 | 34.3 | 32.3 | 36.3 |
| 50. . . . . . . . . . . . . | 30.0 | 28.0 | 31.9 | 31.1 | 28.8 | 33.3 | 24.4 | 22.1 | 26.7 | 35.2 | 33.3 | 36.7 | 26.9 | 24.4 | 29.2 | 30.0 | 28.1 | 31.9 |
| 55. . . . . . . . . . . . . | 25.9 | 24.0 | 27.6 | 26.9 | 24.8 | 28.8 | 21.5 | 19.5 | 23.5 | 30.6 | 28.9 | 32.0 | 23.2 | 20.9 | 25.2 | 25.9 | 24.1 | 27.6 |
| 60. . . . . . . . . . . . . | 22.0 | 20.4 | 23.5 | 23.0 | 21.1 | 24.6 | 18.9 | 17.2 | 20.4 | 26.1 | 24.6 | 27.4 | 19.7 | 17.6 | 21.5 | 21.9 | 20.4 | 23.4 |
| 65. . . . . . . . . . . . . | 18.3 | 16.9 | 19.6 | 19.3 | 17.6 | 20.6 | 16.3 | 15.1 | 17.4 | 21.9 | 20.5 | 22.9 | 16.5 | 14.8 | 18.0 | 18.3 | 16.9 | 19.5 |
| 70. . . . . . . . . . . . . | 14.8 | 13.7 | 15.8 | 15.7 | 14.4 | 16.7 | 13.7 | 12.7 | 14.5 | 17.8 | 16.7 | 18.6 | 13.6 | 12.2 | 14.7 | 14.7 | 13.6 | 15.7 |
| 75. . . . . . . . . . . . . | 11.5 | 10.6 | 12.3 | 12.4 | 11.3 | 13.1 | 11.2 | 10.5 | 11.8 | 14.0 | 13.1 | 14.5 | 10.9 | 9.7 | 11.7 | 11.4 | 10.5 | 12.1 |
| 80. . . . . . . . . . . . . | 8.6 | 7.9 | 9.1 | 9.3 | 8.5 | 9.7 | 9.1 | 8.6 | 9.3 | 10.4 | 9.8 | 10.7 | 8.4 | 7.5 | 8.9 | 8.4 | 7.8 | 8.9 |
| 85. . . . . . . . . . . . . | 6.1 | 5.6 | 6.4 | 6.7 | 6.1 | 6.9 | 7.2 | 6.9 | 7.2 | 7.3 | 6.9 | 7.4 | 6.2 | 5.6 | 6.5 | 5.9 | 5.5 | 6.2 |
| 90. . . . . . . . . . . . . | 4.1 | 3.9 | 4.3 | 4.6 | 4.3 | 4.6 | 5.6 | 5.5 | 5.4 | 4.8 | 4.7 | 4.8 | 4.5 | 4.1 | 4.6 | 4.0 | 3.7 | 4.1 |
| 95. . . . . . . . . . . . . | 2.8 | 2.7 | 2.9 | 3.2 | 3.0 | 3.1 | 4.4 | 4.4 | 4.1 | 3.1 | 3.1 | 3.0 | 3.2 | 3.0 | 3.3 | 2.7 | 2.6 | 2.7 |
| 100. . . . . . . . . . . . | 2.0 | 2.0 | 2.0 | 2.3 | 2.2 | 2.1 | 3.5 | 3.6 | 3.3 | 2.1 | 2.2 | 2.0 | 2.4 | 2.3 | 2.3 | 1.9 | 1.8 | 1.9 |

NOTES: Life tables by race and Hispanic origin have been adjusted for race and ethnicity misclassification on death certificates; see Technical Notes in this report. Estimates are based on provisional data for 2021. Provisional data are subject to change as additional data are received.

SOURCE: National Center for Health Statistics, National Vital Statistics System, Mortality.

U.S. Department of Health and Human Services • Centers for Disease Control and Prevention • National Center for Health Statistics • National Vital Statistics System

2

# EXHIBIT K

# Incarceration shortens life expectancy

*Each year in prison takes 2 years off an individual's life expectancy. With over 2.3 million people locked up, mass incarceration has shortened the overall U.S. life expectancy.*

by Emily Widra, June 26, 2017

New research expands the notions of collateral consequences beyond post-release barriers and discrimination. Two studies show that incarceration shortens life expectancy, at both the national and individual levels.

Nationally, there are so many people living behind bars that the average life expectancy for the total U.S. population has taken a hit. In 2014, the life expectancy at birth in the U.S. was 78.8 years, while most comparable nations (Spain, Sweden, Switzerland, Netherlands, New Zealand, Norway, Italy, Japan, France, Germany, Canada, Australia, Austria) had life expectancies above 81 years.

A 2016 study by Professor Christopher Wildeman offers us an explanation for the U.S. falling behind on measures of population health, like life expectancy: mass incarceration. In comparison to other developed democracies, Wildeman finds that from 1981 to 2007, the U.S. life expectancy

*Each year in prison takes 2 years off an individual's life expectancy. With over 2.3 million people locked up, mass incarceration has shortened the overall U.S. life expectancy by almost 2 years.*

would have increased by more than five years – from 74.1 to 79.4 years – if not for mass incarceration. But given the reality of mass incarceration, the U.S. life expectancy only increased 3.5 years over that time. Without so many people behind bars, he argues, the life expectancy at birth would have increased 51% more than it actually did from 1981 to 2007. The sheer magnitude of how many people are locked up shortens our entire nation's life expectancy.

This isn't just problematic from a population health standpoint; the reduced life expectancy resulting from incarceration impacts individuals, families, and communities on a personal level. In her 2013 analysis of New York state parole data, Professor Evelyn Patterson identified a linear relationship between incarceration and life expectancy: for each year lived behind bars, a person can expect to lose two years off their life expectancy. In the parole cohort she studied, five years in prison increased the odds of death by 78% and reduced the expected life span at age 30 by 10 years. Time served has a direct correlation to years of life lost.

Although both studies suggest that incarceration affects life expectancy, neither study identifies the pathways by which this happens. Incarceration itself may be harmful enough to explain these effects, or it may be one of many adverse experiences putting vulnerable

populations at risk. Either way, it's important to address the appalling conditions of incarceration *and* the lack of opportunities and services for at-risk communities. Most importantly, we need to put less people behind bars. As Professor Patterson points out, unlike many collateral consequences of incarceration, "death cannot be reversed".

*This article was updated in March 2021 to reflect that mass incarceration has shortened the overall U.S. life expectancy by almost 2 years.*

*Emily Widra is a Senior Research Analyst at the Prison Policy Initiative.* (Other articles | Full bio | Contact)

# EXHIBIT L

# HEALTH

RESEARCH

## Incarceration May Shorten Black Americans' Life Expectancy—But Not Whites'

Researchers say findings show the "substantial, long-lasting harms" the criminal justice system and structural racism have on Black Americans' health.



Giles Clarke, Getty Images

By Jenny Eriksen Leary January 04, 2022

For someone recently released from prison, the transition back to life in the community is a stressful and dangerous period. Among many health threats linked to incarceration, research shows that the short-term **risk of death for formerly imprisoned people** can be extremely high, **particularly due to a drug overdose**. Few studies, however, have looked at the impact incarceration has on mortality over the long term.

A new study led by researchers at Boston Medical Center (BMC) found that incarceration was associated with a 65% higher mortality rate among Black Americans—but no association was observed for non-Black Americans. The findings, **published online in** *JAMA Network Open*, suggest that incarceration may contribute to lower life expectancy in Black Americans.

**Incarceration was associated with a 65% higher mortality rate among Black Americans—but no association was observed for non-Black Americans.**

"Our study results show that incarceration can lead to substantial, long-lasting harm to someone's health in the form of higher mortality rates in the years following incarceration—and this effect was much greater among Black individuals than others," says Benjamin Bovell-Ammon, MD, MPH, a visiting fellow in general internal medicine at BMC and a postdoctoral research fellow at The Miriam Hospital in Providence, which supported the research project.

Using data from the **National Longitudinal Survey of Youth**, researchers examined a cohort of nearly 8,000 non-Hispanic individuals who were followed over four decades. Half were male, and 38% percent identified as Black. After 35 years (the median follow-up period), 478 participants experienced at least one incarceration, and 818 had died. The study did not examine causes of death.

## Mass incarceration's harmful effects on people of color

The United States incarcerates a greater number and proportion of people than any other country in the world—with a **dramatic increase in incarcerations** over four decades beginning in the early 1970s. That massive growth in the prison population has disproportionately impacted non-White groups, particularly Black men.

"These results shed more light on the harms of the criminal-legal system and structural racism, which we hope will embolden the public and policymakers to critically reevaluate what public safety means, whose safety really matters, and what types of policies could address the root causes of crime without causing harm to already marginalized communities," says Bovell-Ammon.

*HealthCity elevates the conversation around issues of equity in healthcare. Sign up for our newsletter.*

Read more related to:  **Racial Bias and Equity**  |  **Health Disparities**  |  **Research**



### Jenny Eriksen Leary

Jenny is a former associate director of media relations at Boston Medical Center and has more than 15 years of experience in healthcare communications and public relations.

## Related



**RESEARCH**

**Parental Incarceration Leaves an Estimated 2.2 Million Children Without Medical Care**

Dec 15



**POPULATION HEALTH**

**Innovative Remote Blood Pressure Monitoring Program Significantly Drops Rate of Severe Hypertension Postpartum**

Dec 01



**POLICY AND INDUSTRY**

**Health Equity Accelerator at One Year: Lessons Learned and Next Steps**

Nov 29



**RESEARCH**

**NICU Staff Discuss Their Own Biases and Offer Intervention Ideas**

Nov 10

# EXHIBIT M





Original Investigation | Public Health

# Exposure to Family Member Incarceration and Adult Well-being in the United States

Ram Sundaresh, MD, MS; Youngmin Yi, PhD; Tyler D. Harvey, MPH; Brita Roy, MD, MPH, MHS; Carley Riley, MD, MPP, MHS; Hedwig Lee, PhD; Christopher Wildeman, PhD; Emily A. Wang, MD, MAS

## Abstract

**IMPORTANCE** More than half of the adult population in the United States has ever had a family member incarcerated, an experience more common among Black individuals. The impacts of family incarceration on well-being are not fully understood.

**OBJECTIVE** To assess the associations of incarceration of a family member with perceived well-being and differences in projected life expectancy.

**DESIGN, SETTING, AND PARTICIPANTS** This nationally representative cross-sectional study used data from the 2018 Family History of Incarceration Survey to examine how experiences of family member incarceration were associated with a holistic measure of well-being, including physical, mental, social, financial, and spiritual domains. Well-being was used to estimate change in life expectancy and was compared across varying levels of exposure to immediate and extended family member incarceration using logistic regression models to adjust for individual and household characteristics. Data were analyzed from October 2019 to April 2020.

**EXPOSURES** Respondents' history of family member incarceration, including immediate and extended family members.

**MAIN OUTCOMES AND MEASURES** The main outcome was self-reported life-evaluation, a measure of overall well-being from the 100 Million Healthier Lives Adult Well-being Assessment. Respondents were considered thriving with a current life satisfaction score of 7 or greater and a future life optimism score of 8 or greater, each on a scale of 0 to 10. Other outcomes included physical health, mental health, social support, financial well-being, and spiritual well-being, each measured with separate scales. Additionally, life expectancy projections were estimated using population-level correlations with the Life Evaluation Index. All percentages were weighted to more closely represent the US population.

**RESULTS** Of 2815 individuals included in analysis, 1472 (51.7%) were women, 1765 (62.8%) were non-Hispanic White, and 868 (31.5%) were aged 35 to 54 years. A total of 1806 respondents (45.0%) reported having an immediate family member who was incarcerated. Compared with respondents with no family incarceration, any family member incarceration was associated with lower well-being overall (thriving: 69.5% [95% CI, 65.0%-75.0%] vs 56.9% [95% CI, 53.9%-59.9%]) and in every individual domain (eg, physical thriving: 51.1% [95% CI, 46.2-56.0] vs 35.5% [95% CI, 32.6%-38.3%]) and with a mean (SE) estimated 2.6 (0.03) years shorter life expectancy. Among those with any family incarceration, Black respondents had a mean (SE) estimated 0.46 (0.04) fewer years of life expectancy compared with White respondents.

**CONCLUSIONS AND RELEVANCE** These findings suggest that family member health and well-being may be an important avenue through which incarceration is associated with racial disparities

### Key Points

**Question** Is the incarceration of a family member associated with well-being and projected life expectancy?

**Findings** In this cross-sectional study including 2815 individuals, any family member incarceration was associated with lower well-being and a projected 2.6-year reduction in life expectancy compared with no family member incarceration experience. Among those with any family incarceration, Black respondents had an estimated 0.5 fewer years of projected life expectancy compared with White respondents.

**Meaning** These findings suggest that efforts to decarcerate may improve population-level health and well-being by reducing racial disparities and detrimental outcomes associated with incarceration for nonincarcerated family members.

✚ Supplemental content

Author affiliations and article information are listed at the end of this article.

(continued)

🔓 Open Access. This is an open access article distributed under the terms of the CC-BY License.

Downloaded From: https://jamanetwork.com/ on 01/06/2023

**JAMA Network Open** | Public Health
Exposure to Family Member Incarceration and Adult Well-being in the United States

*Abstract (continued)*

in health and mortality. Decarceration efforts may improve population-level well-being and life expectancy by minimizing detrimental outcomes associated with incarceration among nonincarcerated family members.

───────

*JAMA Network Open.* 2021;4(5):e2111821. doi:10.1001/jamanetworkopen.2021.11821

## Introduction

The last 4 decades have been marked by unprecedented levels of incarceration in the United States, especially in Black communities. An estimated 63% of Black individuals in the US have had an immediate family member who was incarcerated, compared with 45% of individuals in the US overall.[1]

A sizeable body of evidence has illustrated the impacts of incarceration on particular facets of family life of incarcerated individuals.[2-4] Having a family member incarcerated can damage the economic stability of already financially tenuous families, who are then at greater risk of criminal legal system involvement.[3,5] Individuals with family members who are incarcerated are more likely to have reduced social support owing to community stigma attached to incarceration.[6,7] This reduced social support spans generations, with children and grandparents experiencing stigmatization and financial consequences and grandparents experiencing caregiver burden.[7,8]

In addition to outcomes in family social dynamics, incarceration is associated with negative long-term health consequences for family members.[2,7-9] Women with partners who are incarcerated are more likely to experience depression, hypertension, and diabetes.[10] Children with parents who are incarcerated are at greater risk of having worse mental health, substance use, and obesity, with potential long-term risks into adulthood.[2,11] Although there is limited research examining the intergenerational health outcomes associated with incarceration, there is evidence that grandparents with adult children who are incarcerated experience greater psychological distress and depression, especially those with caregiving roles.[12,13]

These data suggest that incarceration of a family member is associated with an impact on broader well-being, defined as a holistic condition encompassing physical health, as well as emotional, social, and spiritual components. In 1948, the World Health Organization defined health as "a state of complete physical, mental and social well-being and not merely the absence of disease or infirmity."[14] Aligned with this definition, well-being extends beyond the presence or absence of specific physical health outcomes and assesses broader lived experiences, such as overall life satisfaction or experiences of overall suffering or thriving.[15] Population-level well-being is associated with key indicators of population health, such as life expectancy,[16] and can sensitively reflect societal contextual factors, like social stability, political freedom, and economic security.[17]

Although prior studies have separately examined social, economic, and health outcomes associated with family member incarceration, no prior literature has examined how the incarceration of a family member is associated with a comprehensive measure of well-being using a national population based study, to our knowledge. To fill this gap, we aimed to explore the association between family member incarceration and well-being.

## Methods

This cross-sectional study was classified as exempt from review or further informed consent by the institutional review board at the Yale School of Medicine because it used deidentified, publicly available data for a secondary data analysis. We followed the Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) reporting guideline for cross-sectional studies.

**Downloaded From: https://jamanetwork.com/ on 01/06/2023**

# EXHIBIT N



# Directory of National Programs

*Federal Bureau of Prisons*

A practical guide highlighting reentry programs available in the Federal Bureau of Prisons.

*5/18/2017*

# Resolve Program

| Program Description | The Resolve Program is a cognitive-behavioral program designed to address the trauma related mental health needs of inmates.   Specifically, the program seeks to decrease the incidence of trauma related psychological disorders and improve inmates' level of functioning.   In addition, the program aims to increase the effectiveness of other treatments, such as drug treatment and healthcare.   The program uses a standardized treatment protocol consisting of three components: an initial psycho-educational workshop (Trauma in Life); a brief, skills based treatment group (Seeking Safety); and Dialectical Behavioral Therapy (DBT), Cognitive Processing Therapy (CPT), and/or a Skills Maintenance Group which are intensive, cognitive-behavioral treatment groups to address persistent psychological and interpersonal difficulties.  The Resolve Program is currently available in many female institutions and a limited number of male institutions. |
|---|---|
| Time Frame | In most instances, inmates are expected to participate in the Resolve Program during their first 12 months of incarceration.   The full Resolve Program protocol takes approximately 40 weeks to complete; however, scheduling conflicts may extend the length of the program.   Inmates also have the option of continuing to participate in the Skills Maintenance Group indefinitely to continue practicing healthy coping skills. |
| Admission Criteria | The Resolve Program is for inmates with a mental health diagnosis due to trauma.   While the Trauma in Life Workshop is the first stage of the Resolve Program, other inmates without a history of trauma may participate in this workshop if institution resources permit. |
| Program Content | The program content focuses on the development of personal resilience, effective coping skills, emotional self-regulation, and healthy interpersonal relationships.   These skills are attained through the use of educational, cognitive, behavioral, and problem-solving focused interventions.   The program materials are modified to be gender responsive to male and female populations. |
| Empirical Support | Empirical support for the interventions utilized in the Resolve Program is well-established.   Seeking Safety, CPT, and DBT appear in multiple evidence-based programs (EBP) registries.   These protocols are also used in the Veterans Administration, the country's largest provider of trauma-related treatment. |
| Applicable Policies | 5330.11 CN-1 Psychology Treatment Programs |

| Institution Locations | The Resolve Program is available at the following facilities: | | |
|---|---|---|---|
| | Mid-Atlantic Region | North Central Region | Northeast Region |
| | FPC Alderson, WV-Minimum (F) SFF Hazelton, WV-Low (F) SCP Lexington, KY-Minimum (F) | ADX Florence, CO-Maximum (M) SCP Greenville, IL-Minimum (F) FCI Waseca, MN-Low (F) | FCI Danbury, CT-Low (M) SCP Danbury, CT-Minimum (F) FSL Danbury, CT-Low (F) (Activating) |
| | South Central Region | Southeast Region | Western Region |
| | FPC Bryan, TX-Minimum (F) FMC Carswell, TX-Adm. (F) | FCI Aliceville, AL-Low (F) SCP Coleman, FL-Minimum (F) SCP Marianna, FL-Minimum (F) FCI Tallahassee, FL-Low (F) | FCI Dublin, CA-Low (F) SCP Victorville, CA-Minimum (F) |
| | (F) Female Program      (M) = Male Program | | |

# APPENDIX II

The Honorable Timothy J. Corrigan

United States District Court Judge

300 N. Hogan Street

Jacksonville, FL 32202


Dear Judge Corrigan,

My name is Donnetta Harris. I am a 43-year-old mother of four. My hometown is Lake City, FL
however, I have been a resident of Jacksonville, FL since 2009. I currently work two full -time
jobs. I have been employed with HCA-Orange Park Primary Care as a Medical Billing Specialist
for almost 11 years and I have been employed with Revenue Group as an Insurance Follow-up
Specialist for 3 months.

I am a friend of Kimberly Claridy-Walker, who is also known to me as Kim. I have known
Kimberly for well over 30 years. She is a little older than me, but we grew up in the same town,
in the same neighborhood in Lake City, FL. Honestly, she's much like an extended family
member.

What I can tell the court about Kimberly is, she is a kind hearted, intelligent woman of good
moral character. She's considerate and always willing to lend a helping hand. Kimberly will give
you the clothes off of her back, without asking any questions or expecting anything in return.
She's a loving wife, mother, grandmother, sister, and friend. Kimberly loves her family more
than life itself and her children mean the world to her.

Kimberly had created a positive platform that she was using to help people and give back to the
community. She was acting as a mentor and had created an online forum through social media,
for those who were interested in becoming business owners, by teaming individuals up with
other current business owners where they could get all the necessary information and tools they
needed to begin their journey as an Entrepreneur.

I can support Kimberly in the future by helping to keep her on the right track by providing a
listening ear and being a positive voice of reason. I can also support her just by being a friend
and someone that she can call on for help or advice, if/when needed.

I would like to thank you for giving me the opportunity to speak on behalf of Kimberly Claridy-
Walker.


Sincerely,

Donnetta Harris

June 6, 2022

The Honorable Judge Timothy J. Corrigan
United States District Court Judge
300 N. Hogan Street
Jacksonville, Florida 32202

Greetings: Honorable Judge Corrigan:

My name is Celeste Belvin Bradley, a retiree from the Columbia County School
District after 40 years of dedicated services. I am a mother and grandmother.
Since my retirement I have returned to work with the district as a Bus Aide for
Special Need students.

 I am writing to you on behalf of a young lady that is schedule to appear before
you, Kimberly Claridy Walker.   Honorable Judge Corrigan, let me tell you what I
know about Kimberly.  I met Kim when she entered the eighth grade at the
middle school where I worked. Her warm smile and loving attitude captured my
heart. My position was at the front desk so I had the opportunity to see students
and their parents as they entered the office.  When Kim would get off her bus in
the mornings she would make a point to stop in and say good morning, or offer a
hug. Being the person who called students to see the assistant principal who
handled discipline, Kim was never one of those students that were sent to the
office for disciplinary offenses. I was truly blessed by her presence.

After Kim left my school. We were not in contact much until later years. God and
time once again allowed me the privilege to be in Kim's presence.  She was the
same sweet, loving young lady I knew from her middle school years.  Always being
respectful and caring to me. I've never experienced her any other way.  I know
that she may not have had the best that life had to offer in her home, but she and
her family made the best of what they had.

Your Honor, I realize that Kim's back is against the wall due to her actions that has
led her to this point in her life. Yes, she may be guilty in the eyes of the law and
some evidence proves this I suppose.  However, I'm sure you've seen time and
time again that a person's environment forces them to do things that they
wouldn't normally do.  I feel that her motive was to make a better life for her
family.  In doing so, maybe the whirlwind of being able to provide for children and
grandchildren became more overwhelming than normal.  Some of us were able to

1

beat the odds against us.  I've had to make some very difficult decisions in my life, some that had me in a very serious position.  I thank God daily for allowing me a second chance to become a productive mother and citizen.  He looked far beyond my faults and saw my needs.  I understand that Kim's situation is serious. I'm asking that in your decision of sentencing her that you would look beyond her faults and see her need to not be away from her young daughter and other children and grands for an extensive period.

Now, Your Honor, you're probably saying that she should have thought of her consequences long before this. Here again, and I'm not a mind reader, I think that she was thinking that her actions were a way to place her family in a better lifestyle. Please sir, consider giving her a sentence where she can return to her family and prove that she can become better than the environment that led her to this dilemma. I may not be the best role model for Kim, but I think that if you were able to ask any of my former students, they would speak highly of me and my love and willingness to help. I would definitely offer Kimberly any help that I could to help her be the woman that God had blessed her to be.  We've all have made some mistakes, and came short of God's glory.

Thank you for allowing me the opportunity to address the court. I apologize for the length of my letter and for any errors.  Praying for your sincere consideration in this request and thanking you in advance.

I also pray that God will continue to hold you and your family safely in his anointed hands, and as we continue to tread through these uncertainties of life that you remain safe and healthy.

Sincerely,
Celeste Belvin Bradley
Lake City, Florida

4 January 2023

The Honorable Timothy J. Corrigan
United States District Court Judge
300 N. Hogan Street
Jacksonville, FL 32202

Dear Judge Corrigan:

My name is Alana Tutwiler and I am submitting a letter of reference for Mrs. Kimberly Claridy-Walker. I am a City of Jacksonville employee, working for the public library system as a youth programming specialist. My professional career began as a classroom educator and I met Mrs. Walker while she was a resident of Shisa House and I was a substitute academic instructor during the summer of 2010/2011. I had the pleasure of assisting Mrs. Walker with the completion of her GED and worked with her and the other women in the program on resume creation, employability skills, interviewing practice, and daily journaling as a way to process their thoughts and emotions in a healthy manner. While there, I witnessed Mrs. Walker take a leadership role among her peers and observed that she was always calm and level-headed. She often mediated disagreements that would arise and the other women greatly respected her opinions. She was dedicated to improving her life and even then, talked about owning her own business.

After Mrs. Walker was released, she found me through social media and we have kept in touch ever since. I have been privileged to witness her reunification with her family and her development as a business owner. She has a strong support system and a family and network of friends who love and support her dearly. She has been dedicated to supporting her family and providing employment opportunities for members of the community. I have no doubt that given the opportunity, she would continue to be a valuable asset to the community. I can personally vouch for her character and faith and would be willing to once again assist her in any further educational endeavors or assistance in employment as needed.

I would like to thank the Court for allowing me to humbly speak on her behalf.

Sincerely,

Alana J. Tutwiler
(904) 674-5694
Alana.tutwiler@gmail.com

The Honorable Timothy J. Corrigan
United States District Court Judge
300 N. Hogan Street
Jacksonville, FL 32202


Dear Judge Corrigan:

My name is Yahvi Saliard I am an ordained minister at Christian Global Outreach Ministries and owner of Eves Body Organic Medspa located in Jacksonville, FL. I met Kimberly Walker as my client while working in my business in 2017 and we soon after connected and became friends. In the time that I have known Kimberly Walker I have known her to be a loyal friend and an amazing mother. Kimberly has a heart of gold and I've watched her go above and beyond to help so many people including myself. In the time I've known her she has impacted our community tremendously, providing jobs for single mothers and helping those less fortunate. She told me that her dream is to mentor young women that have come from similar backgrounds and want to turn their lives around God confirmed this to me in a prophetic dream concerning his desire to use Kimberly to help others. . I truly believe with all my heart that if given the chance Kimberly will do just that. I know she is not perfect and have made many mistakes in life as most of us have but I know her heart has always been in the right place and her love for others is real. . I believe that life lessons have made her a stronger and better person and that she is ready to positively impact those around her if given a chance. I know she is at the mercy of the courts.I thank you for the opportunity to speak on her behalf and i ask that you see her heart and grant her a chance to make things right.


Sincerely,



Yahvi Saliard